## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

S.J.K., by and through S.L.K., as Next
Friend, Parent and Court-Appointed Co-
Guardian, and S.L.K., Individually

          Plaintiffs,

        vs.

Walt Disney Parks and Resorts U.S., Inc.,

         Defendant.

Case No. 6:14-cv-1890-ACC-GJK

### DEFENDANT'S REPLY IN SUPPORT OF WHY THE COURT'S FUNDAMENTAL ALTERATION RULING IN *A.L.* BARS THE 29 RELATED DAS CASES

**THOMAS & LoCICERO PL**

/s/ Jon Michael Philipson
Jon Michael Philipson
Florida Bar No. 092960
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
jphilipson@tlolawfirm.com

Dated:  October 28, 2020

**McDERMOTT WILL & EMERY LLP**

/s/ Kerry Alan Scanlon
Kerry Alan Scanlon (admitted *pro hac vice*)
Jeremy M. White (admitted *pro hac vice*)
500 North Capitol Street, NW
Washington, DC 20001
Telephone: (202) 756-8696
Facsimile: (202) 756-8087
kscanlon@mwe.com
jmwhite@mwe.com

*Attorneys for Defendant Walt Disney Parks
and Resorts U.S., Inc.*

## PRELIMINARY STATEMENT

Plaintiffs' opposition makes clear that they have no evidence beyond what was offered in the *A.L.* trial that would alter the Court's conclusion that the relief they seek would result in a fundamental alteration of Disney's theme park operations.  To escape the consequence of that fact, they assert the injunctive relief in the remaining 29 cases cannot be a "single fix" because each plaintiff family "has a different need, for which a different remedy would be appropriate." This means, they claim, that this Court's conclusion that the relief sought by A.L. would result in a fundamental alteration cannot be applied to the other cases because the relief sought is different in each case.  The fatal defect in this argument is the Eleventh Circuit panel's unanimous view that "the courts are not in a position" to grant individualized injunctive relief to "each new person who has autism . . . who comes into [Walt] Disney World and wants an accommodation." The Court of Appeals decided there would have to be a single solution for everyone—assuming plaintiffs prevailed—that would "go beyond just these 20 plaintiffs or 30 plaintiffs" and it identified a single fix, based on statements by plaintiffs' counsel, which is consistent with the relief A.L. sought at his trial.  That is now the law of this case.

Therefore, on the question whether issue preclusion bars the claims in the remaining cases, all that is left to be decided is whether the facts of this case fit into one of the "established categories" recognized by the Supreme Court where nonparty preclusion is appropriate. Plaintiffs' opposition attacks a concept defendant does not rely on—virtual representation—and does nothing to undercut the showing that this case perfectly fits the third of six recognized exceptions to the rule against nonparty preclusion, where a nonparty is "adequately represented by someone with the same interests who was a party" to the lawsuit.  Because the requirements for nonparty preclusion based on adequate representation are met in this case, plaintiffs in the 29

parallel DAS cases are bound by this Court's fundamental alteration ruling in *A.L.*, and defendant is entitled to judgment in its favor in each case, including the present one.

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF ARE THE SAME BECAUSE THERE MUST BE A SINGLE STANDARD

Plaintiffs assert that during oral argument in the Eleventh Circuit their counsel "always emphasized the fact that every Plaintiff has a different need." Doc. 112 at 10. Based on that overstatement, plaintiffs now argue that "no Plaintiff sues for more than he or she needs" and that 29 different "needs"—and the consequent burden on Disney's business—are what "must be measured against Disney's defense of fundamental alteration." *Id*. at 12. This contention that the fundamental alteration analysis is different in every case fails for two reasons. First, those statements by plaintiffs' counsel were only dropped disconnectedly into what was an incoherent 40-minute response to the panel's simple question: what relief are you seeking? This part of the oral argument was not related to the fundamental alteration issue, and during the two years of litigation in this Court prior to the appeal, every plaintiff made the same argument about the fundamental alteration defense and never suggested that each plaintiff's individual circumstances affected the factual or legal context in which the fundamental alteration defense should be analyzed.

Second, and more important, to the extent that plaintiffs' counsel's answers to the panel's question about the relief being sought suggested that the district court should decide in each family's case what the appropriate modification of DAS should be after individualized hearings, that suggestion was firmly repudiated by each member of the panel as impractical and beyond the role of the court. Each judge recognized there should be a single enforceable standard, not only for the 30 plaintiffs in these cases, but also for all other similarly situated guests who might

visit Walt Disney World in the future.[1]  Plaintiffs' opposition does not mention the panel's reaction to counsel's suggestion that the appropriate level of relief "is very individualized," or that plaintiffs' counsel's response to that reaction was the "single fix" articulated in the court's written decision.

When Judge Royal specifically asked plaintiffs' counsel if he could "tell us how [the purported problem] can be fixed in a practical way" and if plaintiffs were seeking a "single fix," he responded that a "single fix" would be a maximum wait time of 10-to-15 minutes for any given attraction.  Ex. 1 at 5:5-18.  However, plaintiffs' counsel struggled to explain how as a practical matter that "single fix" could be achieved, and the panel repeatedly asked him to be "more detailed" and state how the fix would "be achieved" in a way that would "avoid a sort of consent decree-like situation."  *Id.* at 6:3-8, 10-11; 6:21-7:3; 7:12-15; 13:7-8; 20:16-21.  The panel made it clear there had to be a single standard for everyone, including guests not parties to these cases.  *Id.* at 10:17-25; 11:22-12:2; 19:21-23.  Ultimately, plaintiffs' counsel represented that a minimum of six re-ads and a maximum of ten re-ads would be needed to implement the "fix" and explained that "if readmission passes were chosen as the approach, I've outlined what would work for everyone."  *Id.* at 8:4-9:2; 16:3-5.[2]

---

[1]  *See*, *e.g.*, Ex. 1, *A.L.*, Doc. 339-1, Oral Argument Tr. at 10:20-25 (Newsom, J.) ("[W]e're not going to have like sort of an evidentiary hearing every time in the future that a potential—that a patron needs re-ads.  I'm trying to figure out how, sort of how this binds Disney not with respect to these thirty necessarily but also going forward."); 17:4-14 (Royal, J.) ("[S]ome kind of system has to be put into place where there is an accommodation that is not controlled by the Court.  An injunction may be entered by the Court, but the courts are not in a position to control changing for each new person who has autism who comes in—who comes into Disney World and wants an accommodation."); 20:13-15 (Hull, J.) ("The trial court is not at the park for the next year.")

[2]  It is for this reason that the Eleventh Circuit concluded that "plaintiffs' requested relief . . . has evolved to this 'single fix':  an injunction requiring that Disney guarantee plaintiffs a maximum wait of 10 to 15 minutes for all rides.  More specifically, plaintiffs ask this Court to implement this fix by ordering Disney to provide either:  (1) a card offering automatic access to

Regardless of what plaintiffs now call their requested relief or whether they are seeking six, seven, eight, nine or ten re-ads, they are effectively only seeking a return to the GAC system.[3]  In fact, when plaintiffs' counsel said during the appellate oral argument that plaintiff was requesting "an injunction requiring a wait time, something in the order of 10 to 15 minutes maximum for any given attraction," Judge Hull responded, "that's basically what the GAC did. You want to go back to that GAC . . . [b]ecause that's how that worked."  Ex. 1 at 5:14-22. Therefore, consistent with this Court's factual findings in *A.L.* (Doc. 111 at 18-19), each plaintiff's request for GAC-type relief would fundamentally alter Disney's business model and the theme park experience.  *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 2020 WL 3415008, at *13, *24 (M.D. Fla. June 22, 2020).  No further briefing, evidentiary hearing, or trial will change that result.

## II.  THIS CASE MEETS THE REQUIREMENTS FOR NONPARTY PRECLUSION BASED ON THE "ADEQUATE REPRESENTATION" EXCEPTION

Plaintiffs contend that Disney asks this Court to "directly ignore" the Supreme Court's ruling in *Taylor* and apply a "virtual representation" test.  Doc. 112 at 4.  That is simply not true.[4]  Disney relies on one of the "established categories" recognized by the Supreme Court as

---

the FastPass lines for all rides at all times; or (2) between 6 and 10 guaranteed Re-ad Passes for disabled guests and each person in the group."  *A.L.*, 900 F.3d at 1298.

[3]  During the *A.L.* trial, Disney's witnesses testified (and the industrial engineering studies showed) that giving one to three re-ads to DAS guests had an adverse impact on wait times, causing a fundamental alteration to Disney's business.  *See A.L.*, 2020 WL 3415008, at *13 ("The 'incremental analysis' study showed that the wait times increased significantly for all guests across the board when guests with DAS were given one or more readmission passes. Specifically, if every DAS guest were given two more readmission passes, the standby wait time at the popular Seven Dwarfs Mine Train ride would increase by 39 minutes, from 69 to 108 minutes. . . . Similarly, there were significant increases in wait time for the other popular rides the industrial engineering team studied.")

[4]  *Taylor* held that the D.C. Circuit, in espousing a "virtual representative" doctrine, had gone beyond the six "established categories" (which the Supreme Court had long recognized as exceptions to the rule against nonparty preclusion) by creating a new "amorphous balancing test"

an exception to the rule against nonparty preclusion—adequate representation by a party with the same interests. *Taylor*, 553 U.S. at 894.  This exception requires that (1) the interests must be aligned and (2) either the party understood herself to be acting in a representative capacity or the original court took special care to protect the interests of the nonparty.  *Id.* at 900.  Plaintiffs do not even address this exception much less show why it does not apply here.  Instead, plaintiffs spend several pages analyzing a different doctrine—virtual representation—established by the Eleventh Circuit in *Jaffree v. Wallace*, 837 F.2d 1461 (11th Cir. 1988), 20 years before *Taylor* was decided.

Plaintiffs' focus on the virtual representation doctrine is misplaced.  The exception Disney relies on from *Taylor* sets forth two requirements for what constitutes "adequate representation," both of which are met here.  In fact, plaintiffs themselves admit that their interests are aligned (the first requirement), explaining that they "attempted to sue as a collective group of 44 families, similar in approach to a mass tort or products claim, through a complaint which contained general allegations asserting that they brought similar claims and suffered similar discrimination."  Doc. 112 at 5.  While they claim that D.L.'s trial testimony demonstrates she did not hold herself out as "some sort of class representative" (*id*. at 7), this testimony was later impeached based on D.L.'s public post on the ASGO Facebook page that the relief she and A.L. requested was "*for each individual with autism*," not just for her son.  Ex. 2, Facebook Page (emphasis added) and D.L. Tr. at 42:13-24; *see A.L.*, Doc. 331, Tr. (Vol. 6) at 41:9-44:10.  As this Court recognized, "[a]lthough the suit is only on behalf of A.L., D.L. wants relief that would apply to all persons with autism."  *A.L.*, 2020 WL 3415008, at *19.  Thus, D.L., on behalf of A.L., was acting in a representative capacity, thereby satisfying the second requirement of the exception.

_____

that was "at odds with the constrained approach to nonparty preclusion" which the Court's rulings had advanced.  *Taylor*, 553 U.S. at 898.

Moreover, plaintiffs' assertion that "they have no greater kinship than any other plaintiff who might, without their knowledge, file his or her own case against Disney tomorrow" is false.  At least ten parents of the plaintiffs, including D.L., were active participants in a Facebook group led by autism advocate Kim McClain.  Ex. 3-A, McClain Facebook Chats.  Several of them advised group members, including those who later became plaintiffs, to contact the Dogali Law Group about joining the "class action" suit because, among other things, "[i]t would help to support the assertions of these families and all others with autism."  *Id*. at 2-4, 18, 28-29.  Others discussed how the DAS cases were an attempt to provide a benefit for all autistic children.  *Id*. at 3, 18-19, 28-29.  This is consistent with the advocacy positions taken by D.L. who also posted numerous times on the McClain Facebook page, including telling the Facebook group "[p]lease let's keep the communication open so we can work together, effectively for change."  *Id*. at 30.  Clearly, D.L.'s interests are aligned with the other plaintiffs, many of whom were working together—with the same attorneys—to obtain relief on behalf of all children with autism.

The two ADA cases on issue preclusion cited by plaintiffs, *Taylor v. Wing It Two, Inc.*, 2013 WL 3778315 (S.D. Fla. 2013) and *Access for Disabled, Inc. v. Fort Lauderdale Hosp., Inc.*, 826 F. Supp. 2d 1330 (S.D. Fla. 2011), are inapposite because there was no connection between the parties.  Conversely, in *A.L.*, D.L.'s own Facebook post stated that she was representing the interests of other plaintiffs, all of whom contend as A.L. did that DAS discriminates against them in violation of Title III of the ADA.[5]  Additionally, unlike in *Wing It Two* and *Fort Lauderdale Hosp.*, each plaintiff here consented to being part of a single case with A.L. and jointly filed a complaint in which each of them adopted the same common set of facts.  The cases were later severed by this Court but that was due to the unique circumstances that affected the "necessary" inquiry on which the Court based its summary judgment rulings, not the fundamental alteration

---

[5]  Plaintiffs' assertion that D.L.'s statements are not relevant because she is not a party to her own son's case is disingenuous, given that in each of these cases, the parents have acted as the effective "parties" due to the alleged inability of the disabled parties to represent themselves.

inquiry.  The plaintiffs were then joined together again when the Eleventh Circuit consolidated all 30 cases for oral argument, and a single appellate decision was issued applicable to all cases. Based on these undisputed facts, the plaintiffs in the related cases were adequately represented in the *A.L.* trial, and issue preclusion applies under the exception reaffirmed in *Taylor*.

### III.   PLAINTIFFS' OTHER ARGUMENTS ARE UNCONVINCING AND DO NOT CHANGE THE CONCLUSION THAT ISSUE PRECLUSION APPLIES HERE

#### A.   Ruling on Issue Preclusion Now Will Conserve Judicial Resources

Plaintiffs argue the Court should defer ruling on issue preclusion because it will consume "enormous judicial resources."  Doc. 112 at 2.  But the work has been done already, and the Court expressed its preference to approach the 29 remaining cases with this briefing on issue preclusion.  All that remains is the Court's ruling, in contrast to what would be required to litigate 29 separate cases through trial.[6]  The Court has broad discretion to manage its own docket and should do so by applying issue preclusion rather than having the same witnesses, the same evidence, and the same arguments presented over and over.  It should not stay the 29 related cases either because the evidence could become stale or lost completely in the time it will take to get an appellate decision in *A.L.*  On the other hand, the resources related to an issue preclusion ruling will still be expended whether it occurs now or after the appeal has been decided.[7]

---

[6]  Contrary to plaintiffs' suggestion, these cases cannot be consolidated into a single trial for the same reasons this Court severed them in the first place.  The necessary-and-reasonable inquiries would have to be answered individually in each case because they depend on the evidence each individual plaintiff offers to carry his or her burden of proof.  It would not be more efficient to consolidate these cases and instead would result in a confusing and unnecessarily complex trial. In any event, Disney has already "made some effort to avoid [the 29 future trials]" in the only way that consolidation makes any sense—a single trial on the fundamental alteration issue (if the Court does not find issue preclusion) at which plaintiffs could offer any previously-identified evidence that is not cumulative of the evidence adduced in the *A.L.* trial.

[7]  Plaintiffs suggest it could be avoided if the fundamental alteration ruling in *A.L.* is reversed. The Eleventh Circuit said, in remanding the case, "we need to know some baseline medical

A pending appeal also does not affect the viability of issue preclusion flowing from the decision appealed from.[8]  As the Eleventh Circuit has recognized, "a final judgment retains all of its res judicata consequences pending decision of the appeal."  *Lloyd v. Card*, 283 F. App'x 696, 700 (11th Cir. 2008); *Jaffree*, 837 F.2d at 1467 ("The bare act of taking an appeal is no more effective to defeat preclusion than a failure to appeal.")  The pendency of an appeal in *A.L.* provides no basis to avoid or delay a ruling on issue preclusion in the 29 parallel cases.

## B.   The Adverse Impact on "Wait Times" Is the Most Important Factor Underlying Disney's Fundamental Alteration Defense

Instead of identifying any evidence beyond what was offered in the *A.L.* trial—which they cannot do—plaintiffs make the specious claim that "wait times are at best peripheral to the 'event' at the Disney parks – the rides and attractions."  Doc. 112 at 13.  At the *A.L.* trial, Disney's Industrial Engineering expert Bruce Laval testified that wait times have always been "the number one priority at Disney."  Ex. 4, Tr. (Vol. 4) at 77:5-14.  As this Court explained in its ruling, Mr. Laval directly linked longer wait times (which plaintiffs' requested relief would cause) to decreased guest satisfaction and intent to return—the heart of Disney's fundamental alteration defense.[9]  In any event, it is hard to see how this issue has any relevance to nonparty

---

stuff" about what it regarded as disputed behavioral characteristics of autism.  Because Disney introduced overwhelming and undisputed expert testimony during the *A.L.* trial regarding those characteristics, it is highly unlikely this Court's decision will be reversed, making a stay of the other cases an unlikely prospect for conserving resources.  The evidence on the fundamental alteration defense was similarly one-sided, making reversal on that ground unlikely.

[8]  None of the cases cited by plaintiffs supports delaying a decision on issue preclusion; they merely recognize that a vacated judgment removes its preclusive effect on subsequent decisions, which is not applicable here.  *See, e.g.*, *No East-West Hwy. Comm., Inc. v. Chandler*, 767 F.2d 21, 24 (1st Cir. 1985); *United States v. Nat'l Bank of Commerce*, 775 F.2d 1050, 1050 (8th Cir. 1985) (vacating lower court's decision to remove its res judicata and stare decisis effect).

[9]  Like A.L., none of the plaintiffs in the 29 related cases has tried to rebut Laval's opinions, which he first proffered in January 2016, nor have they disclosed an expert witness on this subject.

preclusion once it has been shown that the requirements for the "adequate representation" exception have been met.[10]

### C.   The Current COVID-19 Situation Does Not Prevent Issue Preclusion

Plaintiffs maintain that the fundamental alteration ruling in *A.L.* does not apply because it was reached before Disney's "changes relating to COVID-19." Doc. 112 at 12. However, as the Court noted in *A.L.*, Disney re-opened Walt Disney World in July 2020 with limited capacity to allow physical distancing at its attractions. Ex. 5, Natter Decl. ¶ 3. In this COVID environment, DAS guests still receive return times, and when they are redeemed, the guest enters the ride through the FastPass line. *Id.* ¶ 4. The smaller crowds that plaintiffs claim make the fundamental alteration analysis speculative are temporary and do not materially affect wait times given the physical distancing and other changes made at attractions due to COVID that tend to offset the impact of smaller crowds. *Id.* ¶¶ 3-4. Therefore, regardless of the current situation, it does not change the fact that plaintiffs' requested relief results in a fundamental alteration.

### D.   Plaintiffs' Claims under the Unruh Act Should Also Be Dismissed Because the Legal Standards and Defenses Are the Same as the ADA

It is not true that a ruling on issue preclusion will not dispose of the nine cases in which plaintiffs have also asserted a claim under California's Unruh Act, Cal. Civ. Code § 51(b), because they were allegedly denied access to the parks. *See, e.g., T.P. v. Disney* (Case No. 6:14-

---

[10] Plaintiffs' comparison of wait times at Disney's parks to the walking rule at issue in *Martin* is unavailing. The Supreme Court found the walking rule challenged in *Martin* to be peripheral in Casey Martin's individual case because it was the "uncontested finding of the District Court that Martin 'easily endures greater fatigue even with a cart than his able-bodied competitors do by walking.'" *Martin*, 532 U.S. at 690. This quote—which explains why the walking rule was not compromised by Martin's request to use a golf cart—was conveniently omitted from plaintiffs' block quote on page 13 of their brief. Unlike in *Martin* where it was found that the walking rule "might be waived in individual cases," here the plaintiffs all seek the same modification and there can be only one system for everyone. *See A.L.*, 2020 WL 3415008, at *24 n.37.

cv-1987), Doc. 1, Compl. ¶ 1.  As plaintiffs acknowledge in their complaint, section 51(f) of the

Unruh Act provides that "[a] violation of the right of any individual under the Americans with

Disabilities Act shall also constitute a violation of this section."  *Id*. ¶ 8 (quoting Cal. Civ. Code

§ 51(f)).  California state courts have consistently interpreted and applied the Unruh Act in

accordance with the burdens of proof and defenses available under the ADA.  *See*, *e.g.*,

*Baughman v. Walt Disney World Co.*, 159 Cal. Rptr. 3d 825, 830-31 (Ct. App. 2013); *Hankins v.*

*El Torito Rests., Inc.*, 74 Cal. Rptr. 2d 684, 693 (Ct. App. 1998).

Indeed, in granting summary judgment, this Court also recognized that its "disposition of

Plaintiff's ADA claim simultaneously decides his Unruh Act claim."  *E.g.*, *T.P.*, Doc. 82 at 9.

Similarly, in *Galvan v. Walt Disney Parks & Resorts U.S., Inc.*, the court acknowledged that

"[a]lthough Plaintiffs do not explicitly state a cause of action under Title III of the Americans

with Disabilities Act ('ADA'), all of Plaintiffs' claims are predicated upon proving a violation of

the statute."  425 F. Supp. 3d 1234, 1237 (C.D. Cal. 2019).  The *Galvan* court then dismissed

plaintiff's Unruh Act claim, concluding that adopting "[plaintiff's] purportedly reasonable

accommodation—a DAS pass conferring priority disability access to those with anxiety—would

fundamentally alter the theme park experience at Disneyland."  *Id.* at 1241.

Because plaintiffs cannot establish an ADA violation due to the preclusive effect of the

*A.L.* decision, their Unruh Act claims necessarily fail.  Plaintiffs thus are not entitled to any form

of recovery—injunctive or monetary relief—under either statute.[11]

---

[11]  The cases cited by plaintiffs on page 14 are inapposite because there the ADA claims for
injunctive relief were moot because the defendant remediated the alleged violations prior to a
ruling on the merits.  No such circumstances exist here.

Dated:  October 28, 2020                    Respectfully submitted,


                                            /s/ Jon Michael Philipson
                                            Jon Michael Philipson
                                            Florida Bar No. 092960
                                            Thomas & LoCicero, PL
                                            601 South Boulevard
                                            Tampa, FL 33606
                                            Telephone: (813) 984-3060
                                            Facsimile: (813) 984-3070
                                            Primary: jphilipson@tlolawfirm.com
                                            Secondary: nparsons@tlolawfirm.com

                                                       -and-

                                            Kerry Alan Scanlon (admitted *pro hac vice*)
                                            Jeremy M. White (admitted *pro hac vice*)
                                            McDermott Will & Emery LLP
                                            500 North Capitol Street, NW
                                            Washington, DC 20001
                                            (202) 756-8696 telephone
                                            (202) 756-8087 facsimile
                                            kscanlon@mwe.com
                                            jmwhite@mwe.com

                                            *Attorneys for Defendant Walt Disney Parks
                                            and Resorts U.S., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all Counsel of Record.

<u>*/s/ Jon Michael Philipson*</u>
Jon Michael Philipson